IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:23-00181-01-CR-W-HFS |
| | ) | |
| | ) | |
| XAVIER MICHAEL BABUDAR, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S 18 U.S.C. § 3553 SENTENCING MEMORANDUM**

Comes now the defendant, Xaviar Michael Babudar, by and through counsel, Matthew T. Merryman, and respectfully moves this Court to consider a non-guideline sentence in this case and sentence Xaviar to a sentence that reflects the factors outlined in 18 U.S.C. § 3553(a)(2)(A)–(D).

**PROCEDURAL HISTORY**

On February 28, 2024, Xaviar appeared before this Court and changed his plea to guilty to Counts 1 and 12 of the 19-count Indictment in Western District of Missouri Case No. 23-00181-01-CR-W-HFS and, pursuant to Rule 20, pled guilty to the 1-count Indictment originally filed in Northern District of Oklahoma, Case No. 23-CR-075-JFH (later reassigned in the Western District of Missouri as Case No. 24-00106-01-CR-W-HFS) (Dkt. No. 34). On July 24, 2024, the Presentence Investigation Report ("PSI") was filed with this Court (Dkt. No. 40). Xaviar's sentencing is scheduled for September 5, 2024.

## SUGGESTIONS SUPPORTING SENTENCE

In imposing any sentence, 18 U.S.C. § 3553 generally directs that the Court shall impose a sentence sufficient, but not greater than necessary. Among the factors for the Court to consider are the nature and circumstances of the offense, the history and characteristics of the defendant, the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford an adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to avoid unwarranted disparities in similar defendants convicted of similar conduct. *See* 18 U.S.C. § 3553(a).

The advisory sentencing guidelines are one of several factors for the Court to consider, but a district court may not begin with the presumption that those guidelines are reasonable. *United States v. Alvizo-Trujillo*, 521 F.3d 1015, 1018–1019 (8th Cir.2008) (*citing United States v. Gall*, 128 S. Ct. 586, 596–597 (2007) and *United States v. Rita*, 127 S. Ct. 2456 (2007)).

## INTRODUCTION

The criteria enumerated at 18 U.S.C. § 3553(a) constitute the controlling framework for sentencing. *United States v. Booker*, 543 U.S. 220 (2005). 18 U.S.C. § 3553(a)(2)(A)–(D) identify the factors to be considered in imposing a sentence as needing:

A. to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense;

B. to afford adequate deterrence to criminal conduct;

C. to protect the public from further crimes of Xaviar; and

D. to provide Xaviar with educational or vocational training, medical care, or other correctional treatment in the most effective manner, (A-D),

2

Other sentencing factors found in 18 U.S.C. § 3553 include: the kinds of sentences available; the sentencing guideline range; the sentencing policy statements; the need to avoid unwarranted sentence disparity; and the need to provide restitution.

The overarching provision of this framework that guides the district court's evaluation of an appropriate sentence is limiting: the court must impose a sentence that is "sufficient, but not greater than necessary" to satisfy the statutory goals of sentencing. *Dean v. United States*, 137 S.Ct.1170, 1175 (2017); *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). The parsimony principle operates to set an independent limit on the sentence a court may impose. *See United States v. Defoor*, 535 F.3d 763, 764 (8th Cir. 2008) (parsimony doctrine provides that "sentence imposed should be the least severe sanction necessary to achieve the purpose of sentencing); *United States v. Martinez-Garragan*, 545 F.3d 894, 904 (10th Cir. 2008) (parsimony principle guides review of sentencing factors). As an initial matter, Xaviar is not forwarding any objections that are inconsistent with the terms agreed upon in the written Plea Agreement and he will withdraw any objections at the sentencing hearing that are considered to be inconsistent. At this time, Xaviar withdraws the objections to paragraphs 26, 51, 69, 70, 78, 79, 87, 88, 96, 97, 104, 105, 112, 113, 127, 131, 138, and 140-143.

A.    **Because the Defendant and the Government (the "Parties") agree that a 3-level Acceptance of Responsibility reduction pursuant to §3E1.1 applies, the Court should sustain Defendant's objection and apply the reduction**.

The Defendant objected to paragraphs 43, 44, 145 and 190 of the PSI, which seek to deny the Defendant a 3-level Acceptance of Responsibility reduction pursuant to §3E1.1. Accordingly, in extraordinary cases, adjustments for both obstruction of justice and acceptance of responsibility may be warranted. *United States v. Honken*, 184 F.3d 961 (8th Cir. 1999). To determine whether defendant's case is "extraordinary," such that his sentence may both be

3

adjusted upward under Sentencing Guidelines for obstruction of justice and downward for acceptance of responsibility, district courts must consider the totality of the circumstances, including the nature of defendant's obstructive conduct and degree of his acceptance of responsibility; among other things, district courts should consider whether obstruction of justice was isolated incident early in investigation or ongoing effort to obstruct prosecution, whether defendant voluntarily terminated his obstructive conduct or was stopped involuntarily by law enforcement, whether defendant admitted and recanted his obstructive conduct or denied conduct at sentencing, and whether defendant, in addition to pleading guilty, also assisted in the investigation of his offense and offenses of others. *Id.*

On February 28, 2024, the Defendant admitted and recanted his obstructive conduct as part of the Plea Agreement and at the change of plea hearing (Dkt. Nos. 34 and 35). Neither through Defendant's objections nor through this memorandum does the Defendant forward any arguments that would withdraw or diminish his prior admissions and recantation of the obstructive conduct. Nor does Defendant have any intention of advancing any objection that would call into question his acceptance of responsibility or admissions and recantation of the obstructive conduct at the sentencing hearing.

Pursuant to the Plea Agreement paragraph 10(i), the Defendant clearly accepted responsibility for his actions and has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Government and the Court to allocate their resources efficiently. Therefore, he is entitled to a three-level reduction pursuant to § 3E1.1(b) of the Sentencing Guidelines. Specifically, the Defendant admitted his involvement in eleven separate robberies and attempted robberies, which allowed eight U.S.

4

Attorney's Offices to avoid preparing for trial and permit those eight U.S. Attorney's Offices and eight District Court's to allocate their resources more efficiently, as detailed in the PSI paragraph 2 (a, i, r-w) and throughout the Plea Agreement. The Parties contemplated the application of a 3-level Acceptance of Responsibility reduction pursuant to §3E1.1 in addition to the 2-level enhancement pursuant to §3C1.1 and agreed to the same. The application of both reduction and enhancement is supported by the extraordinary acceptance of responsibility as detailed above, which the Parties supported through the terms of the Plea Agreement and during the change of plea hearing (Dkt. Nos. 34 and 35). For these reasons, the Defendant respectfully requests the 3-level Acceptance of Responsibility reduction pursuant to §3E1.1 be applied in this matter.

   **B.    Because the evidence does not establish that the Shoplifting conviction from Broomfield, CO qualifies as a prior sentence, the Court should sustain Defendant's objection and remove the criminal history point in paragraph 150 of the PSI.**

The Defendant objects to the criminal history point counted in paragraph 150 of the PSI. According to USSG §4A1.2(c)(2) sentences for misdemeanor and petty offenses are counted except for local ordinance violations (except those violations that are also violations under state criminal law) are never counted. In the State of Colorado,

> A person commits theft when he or she knowingly obtains, retains, or exercises control over anything of value of another without authorization or by threat or deception; receives, loans money by pawn or pledge on, or disposes of anything of value or belonging to another that he or she knows or believes to have been stolen, and:
>    **(a)** Intends to deprive the other person permanently of the use or benefit of the thing of value;
>    **(b)** Knowingly uses, conceals, or abandons the thing of value in such manner as to deprive the other person permanently of its use or benefit;
>    **(c)** Uses, conceals, or abandons the thing of value intending that such use, concealment, or abandonment will deprive the other person permanently of its use or benefit;
>    **(d)** Demands any consideration to which he or she is not legally entitled as a condition of restoring the thing of value to the other person;
>    **(e)** Knowingly retains the thing of value more than seventy-two hours after the agreed-upon time of return in any lease or hire agreement; or

5

**(f)** Intentionally misrepresents or withholds a material fact for determining eligibility for a public benefit and does so for the purpose of obtaining or retaining public benefits for which the person is not eligible. Colo. Rev. Stat. Ann. §18-4-401(1).

And for purposes of punishment a theft is defined as a petty offense if the value of the thing involved is less than three hundred dollars; a class 2 misdemeanor if the value of the thing involved is three hundred dollars or more but less than one thousand dollars; a class 1 misdemeanor if the value of the thing involved is one thousand dollars or more but less than two thousand dollars. Colo. Rev. Stat. Ann. §18-4-401(b)(c)(e).

In the City of Broomfield, Colorado, shoplifting is a local ordinance violation and a person commits the crime of shoplifting when he or she knowingly takes possession of any unpurchased goods, wares, or merchandise of a value of less than $500.00 owned or held by and offered or displayed for sale by any store or mercantile establishment, with the intention of converting such goods, wares, or merchandise to his or her own use, without paying the purchase price thereof. *See* Code and Home Rule Charter of the City and County of Broomfield Ord. § 9-42-010.

The State of Colorado does not have a specific statute criminalizing shoplifting but does interpret the word "shoplifting" as if the word "theft" were substituted. Colo. Rev. Stat. Ann. §18-4-403. However, the Broomfield Municipal ordinance violation relates specifically to "goods, wares, or merchandise" belonging to any "store or mercantile establishment" while the Colorado criminal statutes relate to obtaining "anything of value" from a person.

According to the PSI, on January 14, 2016, Xaviar was found guilty and fined with costs for the offense of shoplifting in Municipal Court of Broomfield, Colorado. The shoplifting offense occurred when Xaviar shoplifted $16.67 worth of toiletries consisting of body wash,

6

toothpaste and sanitary wipes from a Wal-Mart.[1] Defendant believes the municipal ordinance violation of shoplifting is statutorily dissimilar to the criminal codes of the State of Colorado and respectfully requests the Court to sustain Defendant's objection to the criminal history point identified in paragraph 150.

Further, the shoplifting offense identified above is a poverty offense committed for survival needs and counsel can find no evidence that the State of Colorado or the City of Broomfield, CO intended to criminalize poverty and survival in the way suggested by the PSI. Of note, the four criminal history points identified in the PSI are for the municipal ordinance violations of theft, shoplifting, theft and stealing from two Wal-Marts and two Targets[2] respectively. The lost property, which was reclaimed by the Wal-Marts and Targets, consisted of toiletries and groceries totaling a combined monetary value of $111.07. The inclusion of these ordinance violations as criminal history points results in the potential addition of anywhere from 39-65 months to the Defendant's sentencing guideline calculation for finable offenses, which serves to further criminalize poverty.[3] Researchers believe that "criminalizing people

---

[1] Wal-Mart is an American multinational retail corporation that operates a chain of supercenters, discount department stores, and grocery stores in the United States and 23 other countries and enjoys annual revenues in excess of $600 billion; *See generally*

[2] Target Corporation is an American retail corporation that operates a chain of discount department stores and hypermarkets, headquartered in Minneapolis, Minnesota. It is the seventh-largest retailer in the United States, and a component of the S&P 500 Index. The company is one of the largest American-owned private employers in the United States and enjoys annual revenues in excess of $100 billion. *See generally* https://corporate.target.com/press/release/2024/03/target-corporation-reports-fourth-quarter-and-full-year-2023-earnings; *See generally* https://en.wikipedia.org/wiki/Target_Corporation

[3] Men do not despise a thief, if he steals to satisfy his soul when he is hungry; but if he be found, he shall restore sevenfold; he shall give all the substance of his house (Proverbs 6:30-31 King James Version).

experiencing poverty, homelessness, and mental health conditions" creates more harm to our communities.[4]

<u>**NATURE AND CIRCUMSTANCES**</u>

As detailed in the PSI, Xaviar admitted his involvement in eleven separate robberies and attempted robberies, occurring from March 2022 to July 2023, and resulting in the loss of $532,455. Xaviar further admitted that he used a dangerous weapon in the commission of these robberies. The path that would eventually lead to these destructive-life-altering decisions began when Xaviar was at a young age. As a child, Xaviar Michal Babudar was an avid Kansas City Chiefs football fanatic and following the Chiefs and their games gave Xaviar an escape from his troubled childhood.

Beginning in 2013, the shy and introverted young man created a superfan-persona, one that would evolve into the Chiefsaholic, a wolf-masked-red-and-yellow-garbed-football-fanatic. Over the years, Chiefsaholic would allow Xaviar to express himself and connect with the community in ways he had never imagined. Xaviar's presence at Chief's games gradually increased from a couple games a year to attending every game from 2018 through 2021 and regularly being spotted by camera crews at games where he would make cameos during the telecast. In addition to the games, Xaviar enjoyed a robust personal and social media following with tens of thousands of fellow football fans cheering on Chiefsaholic as he worked to pump up the crowds before, during and after Chiefs games. As Chiefsaholic's following grew, Xaviar began to run contests for his fans and routinely gave away sports memorabilia, gift cards and cash prizes to his followers on social media. It was against this backdrop that Xaviar began to get

---

[4] The Vera Institute of Justice has been studying how the criminalization of poverty effects our society and the criminal justice system; *See generally* https://www.vera.org/search?query=poverty.

involved in sports betting. This sports betting evolved into frequent trips to the various area

riverboat casinos where Xaviar developed into an all consuming gambling habit. These gambling

habits turned into high stake baccarat games and large sports bets for thousands of dollars.

Xaviar chronicled his gambling successes on social media to the wonder and delight of his fans

and the gambling highs allowed Xaviar to propel his superfan status while following his beloved

Chiefs to Super Bowl LIV. Sports books and casinos alike feted Xaviar because of his luck, his

daring and his social media presence and Xaviar swam with the tide of his profits. At one time

Xaviar had amassed a fair amount of winnings and he was motivated to use his winnings to buy

his mother and brother a forever house but eventually Xaviar's luck ran out and the addiction of

gambling became uncontrollable.

Within a short time Xaviar was a full-fledged gambling addict and his debts quickly

outstripped his winnings and the losses multiplied with a devastating effect. Isolated and alone,

desperate to feed his gambling addiction, too broke to provide for his family, and too

embarrassed to face his fans, Xaviar embarked on a string of ill-fated decisions that would

forever change his life and the lives of those around him. During nine months, from March 2022

to December 2022, Xaviar traded in his Chiefsaholic superfan uniform for the ski-goggles, work

gloves and BB Gun air pistol, which would become his trademarks for a string of Midwestern

bank robberies. These ill-begotten gains would inevitably find their way into Kansas City area

casinos where Xaviar's gambling addiction went unchecked and the gambling disorder secured

complete control over Xaviar's mind, body and soul.[5] It is no surprise that when Xaviar

---

[5] According to the American Psychiatric Association, gambling disorder is identified by a pattern
of repeated and ongoing betting and wagering that continues despite creating multiple problems
in several areas of an individual's life; *see* https://www.psychiatry.org/patients-
families/gambling-disorder/what-is-gambling-disorder

absconded from his Oklahoma bond that he went straight to Las Vegas, "The Gambling Capital of the World," with his recently received Super Bowl gambling winnings where the cycle could once again begin the devastating machinations that only an addict can explain.[6]

## HISTORY AND CHARACTERISTICS OF XAVIAR

As detailed in the PSI, Xaviar is a 30-year-old United States citizen who has lived in Laguna Beach, California, Eagle Mountain, Utah and most recently in the Kansas City, Missouri metropolitan area. However, during the past 20 years, Xaviar experienced chronic homelessness with his mother and brother due to financial hardships and family trauma suffered as a result of Xaviar's father abandoning the family when Xaviar was an 8-year-old boy. When Xaviar was eight his father abandoned the family without a word and disappeared from Xaviar, Noah and Carla's lives forever. Xaviar was shattered and lost within his emotions but eventually he began to understand how this abandonment was affecting his mother. The abandonment brought with it unforeseeable financial traumas that would result in Xaviar and his family losing their family home and living in poverty and homelessness over the next decades.

According to the United States Interagency Council on Homelessness, ("USICH") millions of Americans suffer from different stages of homelessness.[7] The federal government and agencies that support the homeless population consider homelessness to be an urgent public health issue and humanitarian crisis with wide ranging effects on individuals physical, emotional, and (most importantly) mental health. According to the American Psychological Association ("APA"), the effects of poverty and homelessness on children is devastating, long lasting and

---

[6] Xaviar had placed two preseason $5,000 sports book bets on Mahomes winning the NFL MVP and the Chiefs winning the Superbowl, which resulted in a $100,000 win.
[7] *See generally* https://www.usich.gov/guidance-reports-data/data-trends

results in a wide range of cognitive, emotional, and health-related problems.[8] The APA says that homelessness and poverty can have a tremendous impact on a child's education, physical and mental health, sense of safety, and overall development.

Taking a page from the APA playbook, Xaviar's childhood trauma was compounded by the worry of where he and his mother and brother would live, his access to nutritional food and basic hygiene products, and his desire to provide for his mother and brother. It was during this transition to homelessness that Xaviar began to see himself as the support system for his family and he viewed himself as the one who would provide for his family regardless of the sacrifice. Over the next twenty years, Xaviar kept the mood light and cheerful while he worked to find ways to help his family survive the tide of homelessness that had submerged his American dream.

Xaviar's experience with homelessness presented him with many instances where he witnessed first hand the devastating effects of substance abuse and addiction within the different homeless communities across the country. But even with Xaviar's early exposure to the issues facing homeless and impoverished communities he himself never developed substance abuse behaviors or lost hope in what was possible in life. Willing to help anyone, Xaviar long prided himself on having never suffered from substance abuse or addiction, which allowed him to provide words of support to those less fortunate than him and to those who were suffering from addiction issue. Xaviar's words of encouragement would be a hallmark of his social media presence when he became Chiefsaholic and beginning in 2018 his posts would serve to lift people up.

---

[8] *See generally* https://www.apa.org/topics/socioeconomic-status/poverty-hunger-homelessness-children

However, Xaviar would grow to suffer from another behavior addiction, one of which for millions of Americans is just as problematic and destructive. According to the National Council on Problem Gambling ("NCPG") and other organizations dedicated to helping those with gambling addictions, problem gambling often disrupts a person's daily life and career and gambling disorders are now recognized and diagnosed as mental health disorders.[9]

The problem with gambling in America is so prevalent that National Helplines exists to help people in crisis and most Sportsbooks, Casinos and Gambling Warehouses, knowing that their product is addictive and dangerous, provide the following disclaimer "If you or someone you know has a gambling problem and wants help, call 1-800-GAMBLER."[10] The NCPG encourages gambling addicts to seek help and refers addicts to seek treatment through counseling, therapy, peer-support programs or residential treatment. Gambling addiction is so widespread and dangerous in America that it is recognized as a gambling industry standard to allow gambling addicts to "self-exclude" from gambling websites, Sportsbooks and casinos. Even the United States Courts recognize the seriousness of the problem gambling epidemic and provide "Gambling-Related Conditions" for probation and supervised release.[11]

Xaviar has processed his childhood trauma stemming from homelessness and poverty and he has accepted the fact that he has a sever problem gambling addiction and suffers from the uncurable, but treatable, mental health disorder of gambling addiction. On February 28, 2024,

---

[9] *See generally* https://www.ncpgambling.org/help-treatment/about-the-national-problem-gambling-helpline/; *See also* https://www.mayoclinic.org/diseases-conditions/compulsive-gambling/diagnosis-treatment/drc-20355184.

[10] *See generally* https://www.draftkings.com/ (DraftKings is one of the largest online Sportsbooks, the disclaimer is buried at the bottom of its homepage); *See also* https://www.fanduel.com/ (FanDuel is one of the largest online Sportsbooks and its gambling support disclaimer provides multiple hotlines and state specific resources for gambling addicts).

[11] *See* https://www.uscourts.gov/services-forms/gambling-related-conditions-probation-supervised-release-conditions.

Xaviar appeared before this Court and accepted responsibility for his actions. Xaviar is repentant for his actions and apologetic to his victims to whom he wishes peace and contrition while hoping for forgiveness. According to the PSI, Xaviar' sentencing guideline range is 262 – 327 months. Xaviar prays that this Court sustains his objections to the PSI and find a total offense level of 34 and a criminal history category of II, with a recalculated sentencing guideline range of 168 – 210 months.

Due to his quasi-celebrity status, Xaviar is in a unique position to potentially repay the financial losses created by his actions and to provide restitution to those most affected by his actions. Xaviar respectfully requests this Court to consider a sentence that gives him an opportunity to prove that he is rehabilitated and capable of continuing to be a successful member of his community and society by imposing a sentence of 120-months, which will allow him to reengage with society while he still has valuable years available to him to redress the wrongs he created.

**TO REFLECT THE SERIOUSNESS OF THE OFFENSE,**
**TO PROMOTE RESPECT FOR THE LAW,**
**TO PROVIDE JUST PUNISHMENT FOR THE OFFENSE**

A 120-month sentence would reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense. Xaviar pled guilty to the three charges of Concealment Money Laundering, Interstate Transportation of Stolen Property and Bank Robbery, all class C felonies. The United States of America and our collective society consider these offenses serious and Xaviar has taken full and complete responsibility for his actions in these matters before this Court and his community. Xaviar prays for an opportunity to amend his past indiscretions and be provided a chance to atone for his actions. Xaviar is ready to take responsibility for his role in the instant offense.

As detailed above, Xaviar has processed his childhood trauma stemming from his homelessness and poverty and accepted his gambling addiction. Xaviar has identified the triggers, which led to his serial misfortunes and he is prepared to implement a full time strategy to be successful with his family, employment, church, community and society once he is released from incarceration. Xaviar has promoted respect for the law by accepting responsibility for his actions and timely notifying the government of his intentions to plead guilty. Lengthy incarceration of Xaviar will not provide just punishment for an individual fully committed to rehabilitating himself. However, a 120-month sentence is a lengthy sentence, which would keep Xaviar in custody during his formative years.

A below guidelines sentence can accomplish the goal of deterrence. Studies have shown that "long sentences have little marginal effect on crime reduction through either deterrence of incapacitation." National Research Council, J. Travis, et al., *The Growth of Incarceration in the United States: Exploring Causes and Consequences* 345 (2014). Instead, long sentences incur substantial costs and have been called an "inefficient way to prevent crime." *Id.* Instead, the decision to commit a crime is based more the on the "certainty and swiftness of punishment." *Id.* Further, long sentences incur substantial costs and have been called an "inefficient way to prevent crime." *Id.*

Xaviar has plead guilty to the offense charged by the United States of America, but extending his sentence to encompass much of his young life will not serve to deter him, or others in the community. Instead it would only ensure that he contributes to the ever-increasing incarceration rate in the United States and spends much of his life in prison during what should be his most productive years in society. Lengthy incarceration would also prevent Xaviar the opportunity to repay The United States of America and those affected by his actions. Xaviar is

dedicated to making those individuals whole and he prays the Court grant him a just punishment that provides him the opportunity to show his worth, while it is still possible for him to work and contribute to society.

**TO AFFORD ADEQUATE DETERRENCE
TO CRIMINAL CONDUCT AND TO PROTECT
THE PUBLIC FROM FURTHER CRIMES OF XAVIAR**

A 120-month sentence would afford adequate deterrence to future criminal conduct and protect the public from any further criminal behavior. Xaviar acknowledged his guilt and accepted responsibility for his conduct. Lengthy incarceration of Xaviar will not generate adequate deterrence to criminal conduct or act to protect the public from further crimes because Xaviar is determined to not engage in future criminal conduct. Xaviar is dedicated to combatting his gambling addiction through therapy and support groups and looks forward to the day when he can enjoy sporting events and life events with his family without the shadow of Sportsbooks and gambling lurking over his life. Since July 2023, Xaviar has been separated from his family and this has been a significant event in Xaviar's life. Xaviar has no intentions of putting himself in this type of situation in the future and he is focused on reuniting with his family while they are still around. A sentence of 120 months will afford an adequate deterrence to future criminal conduct and protect the public from further crimes while providing Xaviar an opportunity to return to society, while ensuring he still has time to become a productive citizen, and reengage with his family.

**TO PROVIDE XAVIAR WITH EDUCATIONAL OR
VOCATIONAL TRAINING, MEDICAL CARE, OR OTHER
CORRECTIONAL TREATMENT IN THE MOST EFFECTIVE MANNER**

While incarcerated, Xaviar has focused his energy on planning for his future after incarceration. Over the past month, Xaviar has been working as an orderly cleaning showers and

passing out food trays at USP Leavenworth. Xaviar speaks with his family and discusses future employment opportunities. Xaviar wishes to participate in all rehabilitative, educational and employment based programs including RDAP and the Challenger programs if available to him. Xaviar understands that in order to be successful he must acknowledge and overcome his gambling addiction. Xaviar intends to take advantage of any training or classes available to him while incarcerated and hopes to participate in vocational opportunity programs that will provide him with skills to reenter the labor force upon release. Xaviar is particularly interested in mechanical trades and hopes to gain training in an automotive / mechanical / engineering vocation.

## REHABILITATION

A 120-month sentence will provide sufficient rehabilitation for Xaviar. Xaviar wishes to participate in gambling abuse treatment programs and vocational training while incarcerated, and he is dedicated to taking all available programs to better himself and place himself in the best possible position for success upon release from custody. Xaviar is remorseful for his behavior and dedicated to his future success. Xaviar has already begun on-the-job training by earning the right to be an orderly at USP Leavenworth and it is his goal to continue to grow and gain additional skills while incarcerated. Lengthy incarceration beyond 120-months will not serve to rehabilitate and will only decrease Xaviar's ability to reengage with society and make amends for his behavior. Xaviar will strive upon release to use his status to repay the debts owed to those affected by his actions and to help those who suffer from gambling addiction.

## DISPARITY

Xaviar is aware of potential sentencing disparities in other cases with similarly situated defendants that could have a direct bearing on how this Court views a potential sentence in this

matter. According to the Federal Bureau of Investigation ("FBI") and the United States Department of Justice ("US DOJ"), through it various United States Attorneys Offices across the country, defendants convicted of bank robbery rarely receive sentences that approach 20 years (240 months) unless some sort of aggravating factor exists.[12] In 2024 alone the following sentencing disparities occurred throughout the United States:

On February 22, 2016, in the District of Rhode Island, a 39 year-old defendant of Providence, was sentenced to **92 months** in federal prison for robbing four banks in four days.

On August 15, 2024, in the District of Minnesota a Waite Park man, who demanded $60,000 from the safe while holding five-bank employees hostage with a pair of scissors, was sentenced to **78 months** in prison for the robbery of a St. Cloud bank. According to court documents, the defendant held a pair of scissors against the bank manager's neck and back during the hostage crisis.

On August 8, 2024, in the Central District of California, a defendant was sentenced to serve 72 months in federal prison for three counts of interfering with commerce by robbery while his co-defendant was sentenced to **54 months** for his role in the robberies.

On June 27, 2024, In the Southern District of Georgia, a Georgia man with multiple bank robbery convictions was sentenced to **160 months** in federal prison for the second time after committing a bank robbery while on supervised release.

On June 26, 2024, in the Eastern District of Pennsylvania, a 34 year-old defendant was sentenced to **180 months** for committing two bank robberies in three days after being convicted at trial.

---

[12] *See generally* Bank Robbery News, https://www.fbi.gov/investigate/violent-crime/bank-robbery/bank-robbery-news (A comprehensive government resource detailing sentencing disparities related to bank robberies).

On June 5, 2024, in the Middle District of Georgia, a Macon resident who robbed a Truist Bank Branch in 2023 while on federal supervised release was sentenced to a total of **111 months** imprisonment, which included 87 months in prison for the bank robbery.

On May 23, 2024, in the Southern District of Florida, a Miami multi-convicted felon was sentenced to **240 months** in prison, followed by three years of supervised release for two attempted credit union robberies, one credit union robbery and one bank robbery while on supervised release for a separate case. This sentence came after the defendant was convicted in a three-day federal jury trial.

On May 21, 2024, in the Western District of Missouri, **a** man who was involved in a string of armed robberies in Moberly, Mexico, Marshal, Hannibal, and Pilot Grove, Missouri was sentenced to **15 years** in federal prison. The court ordered the federal sentence to be served consecutively to the state sentence he is currently serving for a robbery conviction in a separate and unrelated case. The defendant plead guilty to one count of armed bank robbery, admitted that he stole $22,027 from Alliant Bank in Boonville, and pointed a Taurus 9mm semi-automatic handgun at bank employees and ordered them to put their hands up.

In May 2024, in the District of Idaho, a 50 year-old defendant, was sentenced to **13 years** in federal prison for a bank robbery in American Falls. According to court records, the defendant entered the bank holding a handgun. He charged toward the first teller's station and pointed a gun directly at the tellers' faces, ordering them to fill a grocery bag with money. Both tellers put money in the bag and the man left the bank, stating "I'll be back," on his way out. The 13-year sentence imposed was a combined sentence of six years for the bank robbery consecutive to seven-years for the use of a gun in the commission of the bank robbery.

On May 7, 2024, in the Northern District of Florida, a 30 year-old defendant and a 31 year-old co-defendant were each sentenced to **51 months** in federal prison, having previously pled guilty to bank robbery.

On May 2, 2024, in the Southern District of Georgia, a serial bank robber was sentenced to **168 months** in federal prison after pleading guilty to Bank Robbery a sentence run concurrently with his state sentence on a kidnapping conviction related to the bank robbery.

On April 17, 2024, in the District of Connecticut, a 29 year-old defendant, was sentenced to **60 months** of imprisonment, followed by three years of supervised release, for robbing three banks in 2022. This defendant was arrested while on pre-trial release, after he disconnected his GPS electronic monitoring bracelet and absconded from his court-mandated rehabilitation center.

On April 17, 2024, in the Eastern District of Missouri, a defendant admitted to committing 12 robberies or attempted robberies that occurred in less than a month in 2021. The defendant plead guilty to 10 counts of robbery, two counts of possession, brandishing and discharge of a firearm in furtherance of a crime of violence and one count of robbery within the special maritime and territorial jurisdiction of the United States. The defendant admitted committing eight armed robberies and one attempted robbery in St. Louis and three in St. Louis County between Oct. 13, 2021, and Nov. 10, 2021. Among his targets were four cell phone stores and three small markets or convenience stores. The defendant also robbed someone on the grounds of Gateway National Arch Park on Oct. 13, 2021, striking his victim on the shoulder with his gun. The next day, he tried to rob someone in the Laclede's Landing area. While the defendant and his victim were struggling over his gun, he stabbed the victim and seriously injured him. In other robberies, he threatened to kill employees of the targeted businesses. He fired his .380-caliber handgun at two different robberies. The defendant resisted arrest and bit the

officer several times. This defendant is scheduled to be sentenced and as part of the plea agreement, both sides have agreed to recommend a **20-year** prison term.

On April 12, 2024, in the Southern District of Indiana, a 64 year-old defendant, who was previously convicted of three armed robberies, six other robberies, and three batteries over a thirty-year span, and was most recently discharged from parole in November 2020, after his release from prison for a prior robbery spree, was sentenced to **11 years** in federal prison after pleading guilty to bank robbery. According to court documents, the defendant entered a credit union, approached the bank teller and gave him a note threatening to "blow [the teller's] f*****g head off" unless he handed over all the money at his station. The teller gave the defendant $20,000 and he subsequently left the credit union. The defendant admitted to committing the robbery and keeping the majority of money in his car. He also stated that he used a portion of money from the robbery to get his car out of pawn, buy new shoes, and buy drugs.

On April 10, 2024, in the Southern District of Indiana, a 56 year-old defendant, was sentenced to **68 months** in federal prison after pleading guilty to bank robbery. In October of 2023, the co-defendant, was sentenced to **76 months** in federal prison after pleading guilty to bank robbery and attempted bank robbery while on supervised release for a previous heroin trafficking conviction.

On April 9, 2024, in the Southern District of Mississippi, a defendant was sentenced to **44 months** in federal prison for bank robbery.

On March 29, 2024, in the Northern District of Texas, a bank robber who attempted to kidnap a Comerica employee was sentenced to **165 months** in federal prison after she plead guilty to bank robbery, brandishing a firearm during a crime of violence, and felon in possession of a firearm.

On March 22, 2024, in the Middle District of Tennessee, a 62 year-old defendant was sentenced to **11 years** in federal prison, followed by 3 years of supervised release for three bank robberies in Nashville.

On March 12, 2024, in the District of Arizona, an axe wielding 53 year-old defendant was sentenced to **87 months** in prison after pleading guilty to one count of Bank Robbery and two counts of Armed Bank Robbery, for a series of bank robberies committed in Tucson, one of which was committed while possessing an axe.

On March 7, 2024, in the Middle District of Pennsylvania, a 30 year-old defendant was sentenced to **84 months**' imprisonment for committing four bank robberies.

The reported multi-decade sentences were usually due to a serious aggravating factor such as the discharge of a firearm, the stabbing of an employee, or the committing of a bank robbery while on supervised release for bank robber.

**SENTENCING**

The Court may sentence Xaviar on Count I to a period of incarceration up to 20 years imprisonment and a fine of up to $500,000 to be followed by a term of no more than 3-years of supervised release, on Count XII to period of incarceration up to 10 years imprisonment and a fine of up to $250,000 to be followed by a term of no more than 3-years of supervised release, and on the other Count I to a period of incarceration up to 20 years imprisonment and a fine of up to $250,000 to be followed by a term of no more than 3-years of supervised release.

According to the PSI, Xaviar's sentencing guideline calculation is 262 – 327 months. Based on the above memorandum, Xaviar respectfully requests this Court sustains his objections to the PSI and find a total offense level of 34 and a criminal history category of II, with a

recalculated sentencing guideline range of 168 – 210 months, and impose a sentence of 120-months in accordance with the guideline factors and the reasons stated herein.

## <u>CONCLUSION</u>

The overarching provision of § 3553(a) that guides the imposition of a sentence emphasizes the need to impose a sentence that is "sufficient, but not greater than necessary." *Kimbrough v. United States*, 128 S. Ct. 558 (2007). The statute as modified by *Booker v. United States*, allows judges "to tailor the sentence in light of other statutory concerns." *Id.* (quoting *Booker*, 543 U.S. 220, 245–46 (2005)). The statute allows judges to consider circumstances that mathematical guidelines cannot. Considering the circumstances of Xaviar's case, his age, acceptance of responsibility, personal and family history, ability to pay restitution to the victims, and in light of the court's ability to correctly tailor a sentence and the criteria laid out by 18 U.S.C. §3553, a sentence of 120-months is both justified and more than sufficient to satisfy the goals of sentencing.

WHEREFORE, Xaviar respectfully requests this Court to impose a sentence of 120-months.

Respectfully submitted,

*/s/ Matthew T. Merryman*
Matthew T. Merryman
The Bates & Merryman Law Firm LLC
P.O. Box 10282
Kansas City, MO 64171
816-223-4482
mmerryman@bmmblaw.com

*Counsel for Defendant Xaviar Michael Babudar*

22

**CERTIFICATE OF SERVICE**

In accordance with FED. R. CRIM. P. 49(a), (b) and (d) and FED. R. CRIM. P. Rule 5(b), it is hereby CERTIFIED that on August 29, 2024, the foregoing motion was electronically filed and all parties were notified pursuant to the Electronic Case Filing System

*/s/ Matthew T. Merryman*
Matthew T. Merryman

Honorable Judge:

I am Carla Ann Babudar respectfully paying homage to your timeless wisdom and quest for righteousness! Xaviar Michael Babudar is my youngest son and having been born on the eve of the 4th of July FOREVER labels him my : "Firecracker Baby"! He projects a human spirit of life exceeding the glow of any fireworks display "finale"! With a gregarious personality Xaviar excelled in sports and showed signs of being a born leader! He possessed the need to WIN at everything; but his "false hopes of grandeur" defied basic common sense.

Xaviar became a "Chiefs celebrity" of sorts through his hard work and persistence. I was surprised at every Chiefs game I attended where fans of all ages would flock to him and request pictures, predictions and "Chief's talk"!

NOTES:

greenroom

He truly connected with the people and this popularity spawned his need to impress everyone more and more.

Xaviar started to use gambling as a small and sensible outlet for supporting his "wandering lifestyle" - but the GREEN MONSTER grew! I became alarmed with the large sums of money Xaviar was willing to risk on one bet - but just assumed he knew proper boundaries. My son succumbed to poor decisions and ultimate desperation! I blame myself everyday for not recognizing his struggles; little did I know making a name for the "CHIEFSAHOLIC" would imperil his own future!

He has a "heart of gold" and has spent his life caring for kittens, his mother and brother. The attitude Xaviar displays today is very positive. Hope is alive!

NOTES:

greenroom

He has expressed remorse for his societal indiscretions honorably. As a family, we long for Xaviar to return as the "Rock of Gibraltar" for our family trio!

As a mother pleading leniency for her son it is obvious I wish I could go back in time and change many things — but we both know that dream NEVER comes true! Moving forward I ask you to fairly scrutinize Xaviar paying his dues — but still giving him a <u>second</u> chance to contribute positively to this world!

I appreciate your attention of my X-MAN "greatest son" memoirs and indulgence for myself!

Handwriting a letter from the heart has always shown a sign of respect and admiration...duly noted!

Luke 6:37 - "Judge not, and you will not be judged; condemn not, and you will not be condemned; forgive, and you will be forgiven."

NOTES

Sincerely,

Carla Ann Bahudas

Carla Ann Bahudas

Honorable Judge:

My Name is Noah Babudar and I am, proud to be the older brother of Xaviar Michael Babudar! I wanted to clarify how important" Xaviar is to our small family consisting of myself my mother" and Xaviar we are all bearing the hardship" of his incarceration EVERYDAY!

Xaviar and I were abandoned" by our father at an early age and will always cherish our special "bond" as brothers. Thank "God" we were compensated with a "true" mother's love! That helped ease the stereotypic dilemma" in our favor! Xaviar has never" lost the love or our FAMILY TRIO!

I realize the "seriousness" of his crime and cannot disregard" the fear and suffering of his victims. May they find peace" and "forgiveness" in their hearts and realize Xaviar is normally a "caring" individual who was led astray by an "ADDICTION" that triggered his behavior!

He wielded" an airsoft gun in an armed robbery "knowing" he would never intentionally "threaten" someone's LIFE! He has "expressed" remorse for his actions to me many" times!

Please allow Xaviar a second chance to "prove" his integrity as a value to society – many people held him in "high" regard and he is a born leader! We need this link" to make our family whole and his support" (emotionally and financially) are "truly" necessary!

Thank you for your time and "merciful" consideration in this matter!

Sincerely"

Noah Babudar

Alexis Farmer
32 Locust Grove Road, Tinton Falls NJ,07753
732-456-9985
Lexi.farmer2@aol.com


Dear Honorable Judge,

My name is Lexi Farmer, I'm 20 years old and born and raised in New Jersey. The majority of my time is taken up by church activities, running thier website and recording services. In the small amount of spare time I do have, I have a number of different websites I run to promote different teams and actors. I also spend time in many charitable causes. I have given speeches about the harms of addiction, I have also given speeches on how to deal with grief and loss to addiction. I came to meet Xaviar Babudar through social media. It was one of the most devastating times in my life when Xaviar showed me such kindness and grace. I had recently lost my grandfather and a week later my best friend. Xaviar reached out to me after seeing a post that I made about the pain that I was suffering with. He did not have to say anything and he did not have to step in but he did. In some ways the tragedies I was trying to overcome were similar to the numerous tragedies that he endured during his life. There is an old expression "It takes one to know one" truer words could not be spoken. Xaviar recognized and saw the depth of my pain and his first instinct was to help me. He did not ask for anything in return. For the weeks moving forward Xaviar continued to check on me, even though he had so many things going on in his life as well. It is very rare today that you will find a stranger so willing to help you and give you comfort. His kind heart shined through the darkness and grief I was dealing with. I never asked him to talk to me, he gave up his time freely to me as if he was someone in my family. I immediately saw the kindness and compassion of this man's soul. After just losing my best friend, I struggled with a deep sadness and painful emotions of losing two very important people in my life. Xaviar extended his heart and hand to me. As you probably know that is a very rare quality in most people today. I understand what he was charged with and I understand a form of punishment is necessary, however I believe that there are circumstances which I ask you to consider. I learned from a number of people about all of the hardships Xaviar had endured throughout his life. He grew up without a father in a very unstable environment, he often times did not have a home, so him and his mother had to sleep in her car or wherever they could. I believe after a life of suffering, pain, and mental anguish it caused him to commit crimes that he normally would have never done if he came from a stable background. Even with all of his heartache, he tried so hard to help others that were suffering and he took the time to listen and help so many others. Given the incredible and difficult challenges he faced he still tried his best to help others. Whether it was a lack of family support, abuse, and abandonment that he suffered, I think that he was desperate to stop other people from experiencing loss like he had. Obviously he has made a few bad decisions, but I'm sure in his mind he developed a Robin Hood type personality. When a child grows up under these circumstances they become broken adults. I truly believe if he was given the chance and the mental and emotional support that he would have the ability to become a responsible person. I believe everyone needs a chance, and the way the world is today, sometimes they need a couple of chances. I'm sure you have had

many difficult cases, I hope that you can recognize that Xaviar's actions stem from an empty childhood without any real parental intervention. All Xaviar had try to do was to make other people, people he did not even know personally happy. I am sincerely requesting that you think about the things I have put forth and given your sterling record you will give him a fair chance.

With sincere appreciation,
Alexis " Lexi" Farmer