**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

UNITED STATES OF AMERICA,

               Plaintiff,

      v.

XAVIAR MICHAEL BABUDAR,

               Defendant.

Case No. 23-00181-01-CR-W-HFS (WDMO)
Case No. 24-00106-01-CR-W-HFS (NDOK)

## SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA

      Despite his many public disguises, Xaviar Michael Babudar's true nature has been revealed following his robberies, and attempted robberies, of eleven banks and credit unions across eight states stealing $847,725 during a sixteen-month period. In all but a few of these robberies, Babudar brandished what appeared to be a firearm. Some of the money he stole was recovered, though most was not. Babudar's robbery spree enabled him to purchase expensive tickets to Kansas City Chiefs games and cultivate a large online following as "ChiefsAholic," a knockoff of the Chiefs' official mascot K.C. Wolf. While Babudar was able to speak to tens of thousands of his followers through social media during his multi-state robbery spree, the almost two dozen bank and credit union employees who he terrorized in 2022 and 2023 never had such a public forum. Many of their traumatic experiences are set out herein.

      Sentencing is scheduled for September 5, 2024, at 9:30 a.m., before the Honorable Howard F. Sachs. As more fully explained below, the United States respectfully recommends that the Court grant an upward variance from the United States Sentencing Guidelines ("Guidelines") advisory range. The United States further recommends a three-year term of supervised release to follow each sentence of incarceration, as well as the imposition of a mandatory restitution order of $532,675 as a condition of any term of supervised release.

# I. Factual Background

## United States vs. Xaviar Babudar (2022-23 Robberies and Attempted Robberies)



Figure 1 - Demonstrative map highlighting Babudar's admitted robberies and attempted robberies of various banks and credit unions. *See* Plea Agreement ("Plea Agr.") ¶ 3 (Doc. 35).

## A.  March 2, 2022 – Great Western Bank Robbery (Clive, Iowa)

"On March 2, 2022, I was helping at another branch when I got the call that no bank manager wants to hear: your branch was just robbed," writes Great Western Bank ("GWB") Victim 1. *See* Victim Impact Statement of GWB Victim 1, p. 1 ("VIS of GWB V1"). "I grabbed my keys and ran out the door to get to my team … I had assumed that it had been the typical note pass and that the robber had likely gotten away with a small amount of cash." *Id.*

Unfortunately, this robbery was not typical. While Babudar did hand the teller a note, which read "I have a gun … Give me $40k" and "You have 90 seconds," he managed to make away with $70,000 in cash. *See* Presentence Investigation Report ("PSR") ¶ 8 (Doc. 40). Investigators later

2

recovered $1,460 in cash, as well as a black glove Babudar discarded. *Id.* Both this glove, and GWB Victim 1, would figure again months later in piecing together Babudar's other robberies.



Figure 2 - Bank surveillance images from GWB robbery in Clive, Iowa, on March 2, 2022. *See* AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT ("Crim Aff."), ¶ 29. (Doc. 1-1).

## B. April 28, 2022 – First National Bank of Omaha Robbery (Omaha, Nebraska)

On the afternoon of Thursday, April 28, 2022, a drive-through window attendant at the First National Bank ("FNB") in Omaha, Nebraska, was doing something common to so many modern employees: watching a mandatory training video. *See* PSR ¶ 10. Unfortunately for the attendant, this training – for what to do during a bank robbery – shifted in seconds from trite to terrifying. Because when the attendant looked up from her screen, she saw a coworker holding her hands up, and saw



that Babudar was pointing a gun in their direction. *Id.* Babudar ordered the bank employees to open the vault, which they did, and he stole $170,680 from the bank's vault and cash drawers before fleeing. *Id.*

Figure 3 - Bank surveillance image from FNB robbery in Omaha, Nebraska, on April 28, 2022. See Crim. Aff. ¶ 47.

3

After Babudar fled, a hidden dye pack exploded and he abandoned all but $7,120 of the stolen money. *Id.* Officers would recover the rest of the cash – $163,560 – covered in red dye inside of a gray pillowcase which was found in a wooded area behind the bank. *Id.*

### C. July 13, 2022 – First Class Community Credit Union Robbery (Des Moines, Iowa)

Babudar knocked over several plastic displays as he jumped the counter at the First Class Community Credit Union ("FCCCU") in Des Moines, Iowa. *See* PSR ¶ 12. When he landed on the employee's side of the counter, he pulled what appeared to be a pistol from his waistband and demanded one of the credit union employees empty their drawer and take him to the vault. *Id.* Surveillance video of the robbery shows Babudar's finger was on the trigger of the gun while he pointed it at the credit union employee's arm. *Id.* "I only want large bills and I need eighty grand," he kept repeating. *Id.* Babudar would steal far more than that, because the credit union had just received a large cash delivery the day before. *Id.* Babudar made off with $303,845, and none of it was recovered. *Id.*



Figure 4 - Bank surveillance image from FCCCU robbery in Des Moines, Iowa, on July 13, 2022. *See* Crim. Aff. ¶ 47.

In the months to follow, before he would go on to rob other banks, Babudar would attend Kansas City Chiefs football games in Tempe, Arizona, Indianapolis, Indiana, and Tampa, Florida. *See* Crim. Aff. ¶¶ 22-23; PSR ¶ 6.

### D.    November 17, 2022 – The Tennessee Federal Credit Union (Nashville, Tennessee)

On November 17, 2022, Babudar recommenced his robberies. On that day, he walked into the Tennessee Federal Credit Union ("TFCU"), climbed over the bank teller counter as he did so many times before, and pushed his gun into the side of a credit union employee. PSR ¶ 14. TFCU



Victim 1 had just returned to work from a break when the robbery happened. *See* Victim Impact Statement of TFCU Victim 1 ("VIS of TFCU V1"), p. 1. "He jumped over the counter to my left and got up right next to me with his face next to my face," writes TFCU Victim 1. *Id.* "He had a gun and he held it on me." *Id.* Babudar said he wanted all of the cash in their drawers. PSR ¶ 14. One of the teller's cash drawers was locked; Babudar pressed his gun into the teller's ribs, threatening, "If you don't open it, I will blow your brains out." *Id.*

Figure 5 - Bank surveillance image from TFCU robbery in Nashville, Tennessee, on November 17, 2022. *See* Crim. Aff. ¶ 53.

Babudar demanded the employees take him to the vault. PSR ¶ 14. One of TFCU Victim 1's coworkers "spoke up and let him know that it takes two of us to open the vault. She later told me that she was afraid that if I tried to open the vault and it didn't open with just my code that he would shoot me." *See* VIS of TFCU V1, p. 1. TFCU Victim 1 and her coworker were able to open the vault on the first try. *Id.* He started filling a plastic bag with cash from the vault. *Id.* Babudar told the credit union employees that if he was given a dye pack he would "come back and put a bullet in your head" (*see* Plea Agr. ¶ 3, p. 6) – presumably due to the amount of money he was previously forced to abandon after the dye pack exploded in the FNB robbery seven months earlier in Omaha, Nebraska.

Babudar was not given a dye pack that day and he stole $125,900. *Id.*

5

Investigators would recover the hat shown above in a wooded area south of the credit union. *See* PSR ¶ 15. DNA was recovered from that hat, which investigators would later match to the black glove recovered from the March 2, 2022, robbery of GWB. *Id.*

Babudar's actions at TCFU still linger with his victims. "Every morning I think about the robbery before I go to work," writes TFCU Victim 1. *See* VIS of TFCU V1, p. 3. While TFCU Victim 1 "had formerly held a full-time job and planned to work until my full retirement age," they are now "struggling to continue to work" at a part time job. *Id.* "As a result of the bank robbery, the branch that he robbed was primarily closed to drive-thru only … The credit union had been a warm and welcoming place where many of the same people came every week. We knew them; we knew about what was happening in their lives. It was like a large social support network, not just a credit union. It had a nice warm feeling. That was destroyed on November 17, 2022. All those relationships are now gone." *Id.* at p. 3-4.

"You did not just steal money," TFCU Victim 2 writes. *See* VIS of TFCU V2, p. 1. "You took more than paper and ink – you stole my safety, my job, my world that day. I feared for my life because you wanted to have fun. I remember the gun you jabbed in my side, the nasty words as you rushed me to the vault. I watched as you hurt my coworkers and scared us to death. I lost a lot that day. You made me fearful, you cost me my job, and I have to rewrite my future because of your greedy, selfish ways … What you took cannot be replaced, but you won't rob me of my strength." *Id.*

Just three days after this robbery, Babudar was in Los Angeles, California attending the Chiefs and Chargers football game. *See* Crim. Aff. ¶ 22.

### E. November 29, 2022 – Attempted Robberies of Wings Financial Credit Union and Royal Credit Union (Savage and Apple Valley, Minnesota)

On November 29, 2022, Babudar attempted not one, but two, robberies of credit unions in suburban Minneapolis, Minnesota. Right at noon, Babudar tried to rob the Wings Financial Credit Union ("WFCU") in Savage, Minnesota. *See* PSR ¶ 17; Crim. Aff. ¶ 62. Babudar entered the bank with what appeared to be a firearm and demanded the credit union employees take him to their vault. *See* PSR ¶ 17. They opened the vault while Babudar held them at gunpoint. After he saw



Figure 6 - Bank surveillance images from attempted robbery of WFCU in Savage, Minnesota, on November 29, 2022. *See* Crim. Aff. ¶ 62.

the vault only contained small bills, he left without taking any of the money.

About an hour and a half later, Babudar tried to rob another credit union, this time the Royal Credit Union ("RCU") in nearby Apple Valley, Minnesota. *See* PSR ¶ 18; Crim. Aff. ¶¶ 66-70. As with the previous credit union nine miles to the west, Babudar entered RCU with what appeared to be a



Figure 7 – Credit union surveillance images from attempted robbery of RCU in Apple Valley, Minnesota, on November 29, 2022. *See* Crim. Aff. ¶ 68.

firearm and demanded employees open their vault; they did. *See* PSR ¶ 18. When Babudar saw that the vault only had small bills, he demanded $100s. *Id.* RCU employees said they didn't keep $100s in the vault, and so Babudar once again left without taking any money. *Id.*

7

**F.    November 30, 2022 – Robbery of First Interstate Bank (Clive, Iowa)**

Many of the same employees who were working during the first GWB robbery in March when Babudar stole $70,000 in case were unfortunately there again when Babudar robbed that same bank eight months later in late November, including GWB Victim 1. *See* Plea Agr. ¶ 3, p. 6; PSR ¶ 20. Other than the name of the bank – this GWB location was now a branch of First Interstate Bank ("FIB") – much was the same in November as it had been in March, except GWB Victim 1 was now working at the Clive, Iowa branch. "Knowing that he had gotten away with a large amount of cash," GWB Victim 1 reflected on the earlier robbery, "I knew that it was only a matter of time before he'd come back." *See* VIS of GWB V1.



Figure 8 – Bank surveillance image from attempted robbery of FIB in Clive, Iowa, on November 30, 2022. *See* Crim. Aff. ¶ 74.

Babudar did, in fact, come back to the scene of his earlier crime, this time with what appeared to be a gun. *See* Plea Agr. ¶ 3, p. 6; PSR ¶ 20. "It was heartbreaking to see my tellers' reactions as they saw him coming and couldn't do a thing to stop him … he took them straight to the vault and held a gun to each of their chests as the person was entering their half of the combo. My female teller had the imprint of that gun on her chest for over an hour and had bruising for several days afterward." *See* VIS of GWB V1.

Babudar's two robberies in nine months at this same location drastically affected the financial institution and its employees each time. "For weeks after each one, we had to constantly relive the experience as well-meaning clients asked us what happened and if he'd been caught yet. We went to a locked lobby after the November robbery, which also earned us daily complaints about the

inconvenience of clients having to use the drive-thru or call to be let in the building," GWB Victim 1 writes. *Id.* A nearby homeowner's association even sent letters to GWB Victim 1 "blaming us for letting a robber run through the properties and demanding to know what we were going to do to prevent future intrusions." *Id.*

While Babudar's robberies would cause FIB to spend over $10,000 in security upgrades, GWB Victim 1 writes that they didn't lose a single team member and each of the employees present that day have since been promoted; GWB Victim 1 says this is a "testament to their resiliency." *Id.*

Eleven days later Babudar was in Denver, Colorado, to watch the Chiefs play their rival Broncos. *See* Crim. Aff. ¶ 22.

### G. December 16, 2022 – Robbery of Tulsa Teachers Credit Union (Bixby, Oklahoma)

"My life changed on December 16, 2022, and not for the better," Tulsa Teachers Credit Union ("TTCU") Victim 1 writes, because that day "my co-workers and I met Xavier (sic) Babudar. Our introduction was one of sheer violence." *See* VIS of TTCU V1.

Figure 9 - Bank surveillance image from attempted robbery of TTCU in Bixby, Oklahoma, on December 16, 2022. *See* Crim. Aff. ¶ 9.

"I said my normal goodbyes … before leaving for work," TTCU Victim 2 writes. *See* VIS of TTCU V2, p. 1. Not long after TTCU Victim 2 arrived at the bank, so did Babudar. *See* PSR ¶ 23.

"Mr. Babudar jumped our teller counter, took a young mother hostage, holding her at gunpoint, forced her into the back room where he then jammed the gun into my ribs and walked me to the vault," TTCU Victim 3 writes. *See* VIS of TTCU V3, p. 1. "I have been in the banking industry for almost 40 years. This was not my first robbery. However it was by far the most violent act I have ever experienced in my life … He jammed that gun into my side so hard I thought

he was going to break one of my ribs. He was very loud, repeatedly threatening to shoot me in the head." *Id.*

"I heard the girls scream," TTCU Victim 2 recalls, "and the sound of his shoe hitting the counter is forever grained into my head." *See* VIS of TTCU V2, p. 1. TTCU Victim 2 ran to the first open door they saw. *Id.* Another employee "literally hid me under his desk. Everything happened fast, but it felt like it lasted forever." *Id.*

Babudar took the money from the vault, put it in a large bag, and fled on a bicycle. *See* PSR ¶¶ 23-24. Babudar was chased by Bixby police officers who caught him after he rode his bike into a cul-de-sac. *Id.* "The Bixby Oklahoma Police Department did a fantastic job," TTCU Victim 1 writes, "they arrived at our branch like the calvary and in minutes apprehended Mr. Babudar. They were able to retrieve every dollar that he had escaped with." *See* VIS of TTCU V1.

Babudar's arrest in December 2022, however, gave the TTCU victims little solace. TTCU Victim 2's "normal" goodbyes that morning were in stark contrast to the next time they saw their family that day. "Even when [name redacted] had got [to the bank], I couldn't leave the building to hold [name redacted]. I had to stay inside until told otherwise." *See* VIS of TTCU V2, p. 1. TTCU Victim 2 left their car at the bank because they couldn't drive after what happened; the next day was no better: "As soon as I walked behind the teller line, I started panicking. The robbery kept playing out over and over again in my head … I ended up going home early that day. I was scared. I am still scared. A couple of weeks later after, I transferred to a different location that was closer to where I live. I thought that it would be easier, but the fear just followed me … I have nightmares now and still can't seem to get a full night's rest." *Id.*

"We lost a very valuable team member after he did this to us," TTCU Victim 4 writes. *See* VIS of TTCU V4. This coworker "went on to put in her notice and was without work for the foreseeable

10

future … [Babudar] pushed her into the vault room, demanding cash. If she did not follow through with his request, he was going to shoot her in the head. I would have quit my job, too." *Id.*

### H.     Babudar's Flight, Additional Robberies, and Capture by the FBI

Babudar remained in state custody from December 16, 2022, until early February 2023. On January 26, 2023, Babudar moved to reduce his bond, suggesting various conditions as an alternative to detention, including GPS monitoring. *See State of Oklahoma v. Xaviar Michael Babudar*, No. CF-2022-4729 (District Court for Tulsa County, Oklahoma). Over the county's verbal objection, the state court granted Babudar's motion on February 7, 2023, and released him from custody with the conditions that he post $80,000 bond, comply with GPS monitoring, and remain within the State of Oklahoma. *Id.*

Days after his release, the Chiefs won the Super Bowl on February 12, 2023, and Babudar won $100,000 from two bets he placed in June 2022 in the midst of his robbery spree. *See* PSR ¶ 28. Babudar received his winnings in the form of a check from the casino in late March 2023, and he withdrew $98,000 from a JP Morgan branch in Broken Arrow, Oklahoma on March 23, 2023. *Id.* Four days later, he removed his ankle monitor and fled. *Id.*

While Babudar evaded detection over the next few months, he robbed two more banks: Heritage Bank in Sparks, Nevada, just east of Reno, on June 8, 2023, and a U.S. Bank branch in El Dorado Hills, California, on July 3, 2023. *See* PSR ¶¶ 26-27.

Due to the crucial work of the Kansas City FBI, Babudar was arrested in Lincoln, California on July 7, 2023, four days after his most recent robbery. *See* PSR ¶¶ 29-30.

11

## II.   SENTENCING RECOMMENDATIONS

### A. Unresolved Guidelines Matters

Babudar has asserted numerous objections to the PSR which are reflected in the Addendum. The United States offers the following responses in an effort to streamline the sentencing hearing. While it is important to arrive at an accurate combined adjusted offense level, many of these objections – even if sustained – would not affect the overall Guidelines calculations, because the parties' contemplated overall adjusted offense level in the Plea Agreement was 37 (before the adjustment for acceptance of responsibility), which tracks with the Probation Office's calculated combined adjusted offense level of 37. *See* Plea Agr. ¶¶ 10(g) & (h); *cf.* PSR ¶ 143.[1]

### 1.  Apparent vs. Actual Firearm (PSR ¶¶ 10, 12, 14, 17, 18, 20, 23)

Babudar objects largely to the phrasing of these events in the Offense Conduct section of the PSR, requesting that these paragraphs be revised to reflect that Babudar carried what "appeared to be" a gun, firearm, or pistol, respectively. *See* PSR Addendum, p. 1-3. These are largely factual objections and the Court's determination on them does not necessarily affect the ultimate Guidelines calculation, though Babudar also objects to certain Offense Level computations which are based on this conduct. For the reasons set out below, the Court need not find that Babudar brandished, possessed, or used an *actual* firearm in the commission of these offenses to hold that the various

---

[1] The inconsistency between Babudar's admissions in the plea agreement and certain objections he asserts – particularly various dangerous weapon enhancements – is puzzling. *Cf.* Plea Agr. ¶ 13(a) ("The defendant understands that the United States expressly reserves the right in this case to … oppose or take issue with any position advanced by defendant at the sentencing hearing which might be inconsistent with the provisions of the plea agreement."). Further, various other United States Attorneys' Offices agreed to not separately prosecute Babudar "so long as the defendant admits the facts and circumstances of (these other robberies) are to be included as relevant conduct in formulating a sentence," and the "defendant abides by the terms of the plea agreement with the United States Attorney's Office for the Western District of Missouri." *See* Plea Agr. ¶ 7.

12

weapons-related Guidelines enhancements are appropriate. Significantly, Babudar has already admitted that he "used a dangerous weapon in the commission of **these robberies**." *See* Plea Agr. ¶ 10(d) (emphasis added).

### 2. Use of a Dangerous Weapon Objections (U.S.S.G. §2B3.1(b)(2)(D); PSR ¶¶ 69, 87, 96, 112)

U.S.S.G. §2B3.1(b)(2)(D) provides a four-level enhancement if a "dangerous weapon was otherwise used" in the commission of the offense; "dangerous weapon" and "otherwise used" are defined in the Commentary to §1B1.1. *See* U.S.S.G. §2B3.1, cmt. n. 1, and §1B1.1, cmt. n. 1(E) and 1(J). "Dangerous weapon" means

> (i) an instrument capable of inflicting death or serious bodily injury; or **(ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument;** or **(II) the defendant used the object in a manner that created the impression that the object was such an instrument** (e.g., a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun).

U.S.S.G. §1B1.1, cmt. n. 1(E) (emphasis added).

The Guidelines explicitly recognize that a weapon "commonly known as '**BB**' or **pellet gun**, that uses air or carbon dioxide pressure to expel a projectile is a **dangerous weapon** but not a firearm." U.S.S.G. §1B1.1, cmt. n. 1(H) (emphasis added). The Eighth Circuit recently affirmed a "dangerous weapon" enhancement (in the drug trafficking context) after the defendant objected to this enhancement because he merely possessed a BB gun. *See United States v. Shelton*, 82 F.4th 1294 (8th Cir. 2023). "Otherwise used" is meant to encompass conduct involving a dangerous weapon that "did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon." *See* U.S.S.G. §1B1.1, cmt. n. 1(J).

Babudar has admitted that he "otherwise used a **dangerous weapon** in the commission of **these robberies**" (*see* Plea Agr. ¶ 10(d) (emphasis added)), and while he does not object to this

13

enhancement for the TTCU robbery (*see* Plea Agr. ¶ 10(d) and PSR ¶ 60), he does object to the enhancements to the FNB, TFCU, WFCU, and FIB robberies, claiming there "is no basis to support this enhancement." *See* PSR Addendum, p. 7-12. Babudar was arrested with a black CO2 BB pistol (*see* PSR ¶ 24), which is a BB gun "that uses air or carbon dioxide pressure to expel a projectile." *See* U.S.S.G. §1B1.1, cmt. n. 1(H).

During the FNB robbery, Babudar used this dangerous weapon while ordering bank employees to open the vault. *See* PSR ¶ 10. During the TFCU robbery, Babudar pressed this dangerous weapon into two separate credit union employees, ordering one to take him to the vault and telling the other "If you don't open it, I will blow your brains out." *See* PSR ¶ 14. During the WFCU attempted robbery, Babudar used the dangerous weapon while pointing it at employees as he demanded that they open the vault. *See* PSR ¶ 17. During the FIB robbery, Babudar used this dangerous weapon by placing it against employees' bodies while ordering them to open the safe; the imprint of the gun was still visible on the bare chest of one of the victims when officers arrived. *See* PSR ¶ 20.

Babudar did not discharge this weapon, but in each of the above instances he did clearly use it in a way that went beyond mere brandishing or possession. This Court should overrule Babudar's objections to the imposition of these enhancements.

### 3. Brandishing or Possession of a Dangerous Weapon Objections (U.S.S.G. §2B3.1(b)(2)(E); PSR ¶¶ 78, 104)

U.S.S.G. §2B3.1(b)(2)(E) permits a three-level enhancement if a "dangerous weapon was brandished or possessed" in the commission of the offense; "dangerous weapon" uses the same definition as set out in the preceding section. *See* U.S.S.G. §2B3.1, cmt. n. 1, and §1B1.1, cmt. n. 1(E). For purposes of these objections, Babudar admits he "used a dangerous weapon in the commission

14

of these robberies." *See* Plea Agr. ¶ 10(d).[2] "Brandished" in this context "means that all or part of the weapon was displayed, or the presence of the weapon was otherwise made known to another person, in order to intimidate that person, regardless of whether the weapon was directly visible to that person." *See* U.S.S.G. §1B1.1, cmt. n. 1(C). "Accordingly, although the dangerous weapon does not have to be directly visible, the weapon must be present." *Id.*

Babudar objects to the enhancements as applied to the FCCCU robbery and the RCU attempted robbery, claiming there "is no basis to support this enhancement." *See* PSR Addendum, p. 8-12. During the FCCCU robbery, Babudar had the dangerous weapon tucked into his waistband, and later surveillance video review showed Babudar pointing the dangerous weapon at a credit union employee's arm while his finger was on the trigger. *See* PSR ¶ 12. During the RCU attempted robbery, Babudar had the dangerous weapon on his person as he entered the credit union. *See* PSR ¶ 18.

Babudar clearly displayed all or part of the dangerous weapon in the commission of both the FCCCU robbery and the RCU attempted robbery. This Court should overrule Babudar's objections to the imposition of these enhancements.

### 4. Threats of Death (U.S.S.G. §2B3.1(b)(2)(F); PSR ¶¶ 51, 127)

U.S.S.G. §2B3.1(b)(2)(E) permits a two-level enhancement if a "threat of death was made" during the commission of the offense. A "threat of death," in the context of this provision, "may be in the form of an oral or written statement, act, gesture, or combination thereof." *See* U.S.S.G. §2B3.1, cmt. n. 6. A defendant "does not have to state expressly his intent to kill the victim in order for the

---

[2] Babudar seemingly reaffirms this position in his sentencing memorandum, writing, "Xaviar further admitted that he used a dangerous weapon in the commission of these robberies." *See* Defendant's 18 U.S.C. § 3553 Sentencing Memorandum (Doc. 48), p. 8. It is unclear if Babudar stands behind his objections to those enhancements, as he does not address this incongruency in his memorandum.

15

enhancement to apply." *Id.* Courts are directed to "consider that the intent of this provision is to provide an increased offense level for cases in which the offender(s) engaged in conduct that would instill in a reasonable person, who is a victim of the offense, a fear of death." *Id.*

Babudar objects to the enhancements to the GWB and Heritage Bank robberies, asserting there is "no basis to support this enhancement." *See* PSR Addendum, p. 7, 13.

Babudar admits that in the GWB robbery he "handed the bank teller a note demanding money and indicating that he had a firearm" and the evidence in the Heritage Bank robbery was that Babudar showed the bank employee a message on his phone which read, "I have a gun. I want all of your 50s and 100s." *See* Plea Agr. ¶ 3, p. 2; PSR ¶¶ 8, 26. The Eighth Circuit has held that when a defendant provides a "note indicating he had a gun" this conduct "amounted to a threat of death." *See United States v. Ward*, 56 F. App'x. 759 (8th Cir. 2003) (unpub.) (citations omitted).

### 5. Physically Restrained to Facilitate Commission of the Offense Objections (U.S.S.G. §2B3.1(b)(4)(B); PSR ¶¶ 70, 79, 88, 97, 105, 113)

U.S.S.G. §2B3.1(b)(4)(B) permits a two-level enhancement if "any person was physically restrained to facilitate the commission of the offense or to facilitate escape." While the Guidelines state that this provision "means the forcible restraint of the victim such as by being tied, bound, or locked up," those examples are not exhaustive. *See* U.S.S.G. ¶1B1.1, cmt. n. 1(L); *cf. United States v. Rosario*, 7 F.3d 319, 320-21 (2d Cir. 1993) ("The use of the modifier 'such as' in the definition indicates that the illustrations of physical restraint 'are listed by way of example rather than limitation.'") (citations omitted).

The Eighth Circuit has repeatedly held that, under §2B3.1(b)(4)(B), a defendant "physically restrains persons if the defendant creates circumstances allowing the persons no alternative but compliance." *United States v. Stevens*, 580 F.3d 718, 720 (8th Cir. 2009) (quoting *United States v. Kirtley*,

16

986 F.2d 285, 286 (8th Cir. 1993)). *Stevens* affirmed similar Eighth Circuit holdings in *Kirtley* and *United States v. Schau*, 1 F.3d 729 (8th Cir. 1993).

Babudar admits this enhancement applies to the TTCU robbery (*see* Plea Agr. ¶ 10(e) and PSR ¶ 61), but objects to its imposition relating to the FNB, FCCCU, TFCU, WFCU, RCU, and FIB robberies and attempted robberies, asserting there "is no basis to support this enhancement." *See* PSR Addendum, p. 8-13.

During the FNB, Babudar ordered the bank employees to the vault at gunpoint. *See* PSR ¶ 10. During the FCCCU robbery, Babudar ordered the credit union employees to take him to the bank vault and pointed the weapon at an employee. *See* PSR ¶ 12. During the TFCU robbery, Babudar pressed the weapon into two employees and directed them to open the vault. *See* PSR ¶ 14. During the attempted robbery of WFCU, Babudar demanded the employees open the vault while holding them at gunpoint. *See* PSR ¶ 17. During the attempted robbery of RCU, Babudar entered the credit union holding the weapon and demanded the employees open the vault. *See* PSR ¶ 18. During the FIB robbery, Babudar ordered the employees to open the vault at gunpoint, and pressed his weapon into two of the bank employees. *See* PSR ¶ 20.

In each instance Babudar – through his actions, demands, and orders of the bank and credit union employees – created circumstances allowing these employees no alternative but compliance. The Court should overrule Babudar's objections.

### 6. Criminal History Computation (U.S.S.G. §4A1.1; PSR ¶¶ 147-157)

"The Sentencing Guidelines make clear that in a federal case, all prior sentences are points of criminal history unless specifically exempted." *United States v. Foote*, 705 F.3d 305, 307 (8th Cir. 2013) (citing U.S.S.G. §§4A1.1, 4A1.2). In *Foote*, the Eighth Circuit affirmed the district court's assessment

of one criminal history point for a petty misdemeanor marijuana possession conviction. *Id.* "The Guidelines are 'explicitly designed to apply to prior sentences in which only a fine was ordered.'" *Id.* (quoting *United States v. Strange*, 102 F.3d 356, 363 n. 9 (8th Cir. 1996)). *Foote* also cites to *United States v. Yarrington*, 634 F.3d 440, 453 (8th Cir. 2011), which found that a criminal mischief conviction resulting in a $50 fine was countable in calculating the appropriate criminal history category in affirming the district court's judgment.

Section 4A1.1(c) assigns one point for each prior sentence that does not involve a sentence of imprisonment of at least one year (§4A1.1(a)) or sixty days (§4A1.1(b)). "Prior sentence" includes "any sentence previously imposed upon adjudication of guilt, whether by guilty plea, trial, or plea of nolo contendere, for conduct not part of the instant offense." *See* U.S.S.G. §4A1.2(a)(1). "Sentences for misdemeanor and petty offenses are counted," with certain exceptions which are not present here. *See* U.S.S.G. §4A1.2(c).

Babudar objects to various misdemeanor convictions for theft, shoplifting, and stealing, asserting that they should not be counted because the "disposition of these offenses are not criminal justice sentences and are not similar to the instant offense." *See* PSR Addendum, p. 15. Respectfully, whether or not the previous misdemeanor offenses are viewed as a "criminal justice sentence" is irrelevant here; §4A1.1(e) addresses the applicability of whether a previous conviction is viewed as a "criminal justice sentence," and the Probation Office has already indicated Babudar was not assessed additional points under this section. *See* PSR ¶ 156. Further, Babudar offers no rationale for how the misdemeanor convictions at issue – theft, shoplifting, and stealing – are in any way similar to the types of misdemeanor offenses contemplated for exclusion by operation of §4A1.2(c). *Cf. Foote*, 705 F.3d at 307 ("The Guidelines do exclude some prior sentences from being considered as points of criminal history. U.S.S.G. §4A1.2(c)(2) (e.g., minor traffic infractions and public intoxication).").

18

Babudar's criminal history was appropriately and accurately assessed by the Probation Office, and this Court should overrule his objection. Should the Court sustain Babudar's objections, this Court should alternatively consider an upward departure as his criminal history category would substantially underrepresent the seriousness of his criminal history and given the likelihood that he will commit other crimes. *See* U.S.S.G. §§4A1.3(a)(1), (a)(2)(A), (D), and (E), and (a)(4)(A).

### 7. Acceptance of Responsibility (U.S.S.G. §3E1.1; PSR ¶¶ 43-44, 145)

Babudar objects to the lack of a reduction for acceptance of responsibility. *See* PSR Addendum, p. 4-7. Notwithstanding his extensive objections, the United States believes that Babudar's early decision to seek a global plea and decision to resolve these matters short of trial warrants a reduction for acceptance. *See* U.S.S.G. §3E1.1, cmt. n. 1(H). While Babudar did flee from state custody subsequent to his original arrest in December 2022 and admits that this conduct supports the application of an obstruction enhancement (*see* Plea Agr. ¶ 10(h); PSR ¶¶ 2(h), 28), Babudar's admission of guilt and relevant conduct for multiple robberies,[3] thus saving the United States of America from having to prosecute this conduct in multiple other jurisdictions, suggests this is one of those "extraordinary cases"[4] contemplated by the Guidelines in which adjustments under §§3C1.1 and 3E1.1 are warranted.

---

[3] *See* U.S.S.G. §3E1.1, cmt. n. 3 ("Entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction, and **truthfully admitting or not falsely denying any additional relevant conduct for which he is accountable under §1B1.3 (Relevant Conduct)** … will constitute significant evidence of acceptance of responsibility for the purposes of subsection (a)." (emphasis added).

[4] *See* U.S.S.G. §3E1.1, cmt. n. 4.

**B.    Recommended Sentence of Imprisonment and Supervised Release**

The only difference between the United States Probation Office and the United States of America relates to Babudar's eligibility for a reduction for acceptance of responsibility under §3E1.1. While Babudar has many outstanding objections, he admitted in the Plea Agreement to a combined offense level of 37 before acceptance consideration (*see* Plea Agr. ¶ 10(g) & (h)). To the extent Babudar's objections (individually or collectively) dispute his agreement that his overall offense level is a 37 (before acceptance), advocating those positions would constitute a breach of the plea agreement.

| Respective Positions on Application of the Guidelines | | | | |
|---|---|---|---|---|
| | **USPO** | **USAO** | **Def.** | **Plea Agr.** |
| Base Offense Level (§2B3.1(a)) (PSR ¶ 58) | 20 | 20 | 20 | 20 |
| Involved Taking of Property of a Financial Institution (§2B3.1(b)(1)) (PSR ¶ 59) | +2 | +2 | +2 | +2 |
| Use of a Dangerous Weapon in Commission of the Offense (§2B3.1(b)(2)(D)) (PSR ¶ 60) | +4 | +4 | +4 | +4 |
| Defendant Physically Restrained a Person to Facilitate the Offense (§2B3.1(b)(4)(B)) (PSR ¶ 61) | +2 | +2 | +2 | +2 |
| Loss Exceeded $95,000 (§2B3.1(b)(7)(C)) (PSR ¶ 62) | +2 | +2 | +2 | +2 |
| Grouping of Multiple Robberies (§3D1.2(d) & §3D1.4) (PSR ¶ 142) | +5 | +5 | +5 | +5 |
| Obstruction of the Administration of Justice (§3C1.1) | +2 | +2 | +2 | +2 |
| Acceptance of Responsibility (§3E1.1) (PSR ¶¶ 2(i); 43-44) | N/A | -3 | -3 | -3 |
| Combined Total Offense Level (PSR ¶¶ 2(g); 143) | 37 | 34 | 34 | 34 |
| Criminal History Category (PSR ¶¶ 155-157) | III | III | I | -- |
| Range of Punishment | 262-327 mos. (Zone D) | 188-235 mos. (Zone D) | 151-188 mos. (Zone D) | 151-188 mos. or 188-235 mos.[5] (Zone D) |

Should the Court concur with the United States Probation Office's position on the acceptance of responsibility, given a total offense level of 37 with a Criminal History Category III, Babudar's recommended range of incarceration under the Guidelines is **262 to 327 months'** imprisonment.

Should the Court concur with the United States' position on the Guidelines, given a total offense level of 34 with Criminal History Category III, Babudar's recommended range of incarceration under the Guidelines is **188 to 235** months' imprisonment.

Based on the sentencing factors set forth in 18 U.S.C. § 3553(a) set out below, the United States requests the Court vary upward from the Guidelines range. Consistent with the Plea Agreement, the United States requests a concurrent sentence of **240 months' imprisonment** on Count 1 in the WDMO case (23-00181-01-CR-W-HFS), **240 months' imprisonment** on Count 1 of the NDOK case (24-00106-01-CR-W-HFS), and **120 months' imprisonment** on Count 12 of the WDMO case, followed by three years of supervised release for each count.

### 1. Nature and Circumstances of Defendant's Robberies Warrant a Lengthy Sentence

Congress passed the Bank Robbery Act of 1934 over growing concern of "interstate operations by gangsters against banks – activities with which local authorities were frequently unable to cope." *Jerome v. United States*, 318 U.S. 101, 102, 63 S.Ct. 483, 87 L.Ed. 640 (1943). Prior to this legislation, banks organized under federal law were protected against embezzlement but "crimes such as robbery, burglary, and larceny directed against banks were punishable only under state law." *Id.*

---

[5] The Plea Agreement's baseline range of punishment depends on Babudar's Criminal History Category, and the parties did not prospectively agree on this category. *See* Plea Agr. ¶ 10(k).

In urging Congress to pass this legislation (and other similar laws), the Attorney General wrote that these crimes are often perpetrated by those who were not confined to "any particular city, county or state," but rather would "move rapidly from the scene of one crime of violence to another across State lines, often passing through several States into another section of the country." 78 CONG. REC. 2947 (1934). These criminals had "taken advantage of the limited jurisdiction possessed by State authorities in pursuing fugitive criminals," he continued, noting that Department of Justice officials had concluded that "territorial limitations" prevented local authorities "from adequately protecting their citizens from this type of criminal." *Id.*

Babudar's multi-state violent robbery spree fits squarely within the same series of crimes contemplated and criminalized by Congress in its passage of this legislation, which preceded 18 U.S.C. § 2113 (one of Babudar's offenses of conviction).[6] Babudar robbed, or attempted to rob, almost a dozen banks and credit unions throughout the United States, stealing approximately $847,725 over sixteen months. *See* PSR ¶¶ 3-32. Like so many of the Depression Era bank robbers whose violent crimes spurred passage of the bank robbery statute, Babudar escaped from state custody and quickly resumed robbing banks. Babudar's robbery spree, coupled with the immense yield from these robberies, places him well above the average as compared to similar bank robbers, and is far more comparable to those individuals that spawned the criminalization of bank robberies at the federal level.

Virtually all of Babudar's robberies entailed some form of violence, whether it was the physical assault of the bank and credit union employees, the brandishing and use of what appeared to be a

---

[6] "Congress enacted the precursor to § 2113(a) in response to an outbreak of bank robberies committed by John Dillinger and others who evaded capture by state authorities by moving from State to State." *Carter v. United States*, 530 U.S. 255, 280 (2000) (Ginsburg, J. dissenting) (citing *Jerome*, 318 U.S. at 102).

22

firearm, or both. Babudar compounded these crimes by laundering these proceeds through Kansas City area casinos following these robberies.

### 2. The Defendant's History and Characteristics

Babudar's early life was spent at various locations between Missouri and California, and his numerous arrests and convictions in disparate places such as Hays, Kansas, Broomfield, Colorado, Brooklyn Center, Minnesota, and San Bernadino, California foreshadow his later string of bank robberies that in similar locales that reached beyond just the Kansas City metropolitan area (where he also had numerous arrests and convictions throughout his life). *See* PSR ¶¶ 149-165; 167. His employment history (which is self-reported and unverified) further demonstrates Babudar's inability – and more significantly, clear unwillingness – to keep a job for more than a few months. *See* PSR ¶¶ 178-182.

But this is not how he chose to portray himself to the public. Rather, even in the midst of his robbery spree, Babudar touted his work ethic, casting himself as a role model of sorts for his followers. In a since-deleted post on his ChiefsAholic Twitter (now X) account, Babudar boasted, "After graduating KSU in 2016 I was working a warehouse job making $12 an hour …



Figure 10 - Screen capture of defendant's Twitter post, which he published three days before his arrest in Bixby, Oklahoma.

Today I manage multiple warehouses throughout the Midwest region and make an excellent living,

and I'm only 28 years old. Hard work pays off and don't let ANYONE tell you otherwise!"[7]

This ChiefsAholic persona[8] was the way he chose to present himself to the world. But to the many bank and credit union employees he victimized between 2022 and 2023, Babudar put on a different mask – usually a ski or paintball mask coupled with goggles – which was also meant to conceal his true identity. The wolf and ski masks he wore were attempts to hide his true nature from the world, because underneath each of them Xaviar Babudar is a man who violently robbed, or attempted to rob, upwards of a dozen banks. That violent bank robber is who is being sentenced, and his extensive, violent crimes justify a lengthy term of imprisonment.

Babudar's addiction to the Chiefs is surpassed only by his relentless bank robberies, but, as GWB Victim 1 writes, "[m]y team didn't deserve to be held at gunpoint twice just so a man in a wolf suit could travel the country watching football and placing extravagant bets." *See* VIS of GWB V1, p. 1. "I hope that he remains [in jail] for as long as sentencing guidelines allow." *Id.*

---

[7] "How a Football Superfan in a Wolf Costume Ended Up in a Cage," The New York Times, Kevin Draper, Jan. 28, 2023, at https://www.nytimes.com/2023/01/28/sports/football/kansas-city-chiefsaholic-wolf-costume.html. This article quotes from Babudar's then-Twitter account, which hyperlinks to this now-deleted post. And while Babudar's self-reported employment history does suggest he worked in a warehouse in or around 2016, he has no noted employment after 2017. *See* PSR ¶¶ 178-82. Babudar says he left Amazon because he was "just tired of it" and wanted a change of scenery. *See* PSR ¶ 178.

[8] CARL JUNG, TWO ESSAYS ON ANALYTICAL PSYCHOLOGY 207-08 "The persona is a complicated system of relations between the individual consciousness and society. It is a relatively suitable kind of mask which, on the one hand, is calculated to make a definite impression upon others, while, on the other, it cloaks the true nature of the individual."

### 3. The Need to Promote Respect for the Law, Provide Just Punishment, and Afford Adequate Deterrence to Criminal Conduct

Babudar's initial arrest and detention for robbing TTCU in Bixby, Oklahoma, was apparently not enough to deter him from doing so again on at least two occasions after he fled prosecution. *See* Plea Agr. ¶ 3, PSR ¶¶ 26, 27. Babudar rewarded the state court's leniency by cutting his ankle monitor and fleeing, and he would go on to rob two more banks – victimizing even more tellers and bank employees – before he was finally tracked down and arrested by the FBI in July 2023. *Id.* at 28.

Babudar's large number of violent crimes, coupled with his social media presence, has meant that this case has gained an unusual amount of attention from various media outlets compared to most criminal defendants; his arrest by the FBI while he was a fugitive has only increased his infamy. *See* PSR ¶ 184. "Mr. Babudar's near celebrity status is a travesty," TTCU Victim 1 writes, "to all those who have been victims of his crime spree … Please show the world that behaviors like this will be dealt [with] … and send a message to those that find any part of this story entertaining, that actions like these will not pay." *See* VIS of TTCU V1, p. 1.

A severe and lengthy term of imprisonment will promote respect for the law, provide just punishment, and afford adequate deterrence to the many who will hear of this sentence.

### 4. The Need to Protect the Public from Further Crimes of the Defendant

Babudar is a hopeless recidivist. He has been convicted or arrested on a nearly annual basis since he was seventeen years old, for various crimes such as theft, stealing, shoplifting, burglary, false checks, and trespassing. *See* PSR ¶¶ 149-165. Even after he was arrested once for bank robbery in this case, he went right back to doing it again. "He is a common thief, with no redeeming qualities," writes TTCU Victim 3, and he "didn't waste anytime (sic) robbing another financial institution once he was released and he went on the lam … He's already shown that if he is released he will repeat his violent behavior." *See* VIS of TTCU V3, p. 2.

TTCU Victim 4 shares the view of their coworker, writing that Babudar "does not deserve any more chances to be out on the streets causing harm to others. If he robbed 10+ financial institutions without ever blinking, what makes you think he'll never do such a thing again?" *See* VIS of TTCU V4, p. 1.

"I remember in March of 2023 [when] I got a text message notifying me that [Babudar] had cut his ankle monitor off," TTCU V2 recalls. *See* VIS of TTCU V2, p. 2. "I started having a panic attack." *Id.* "I ask that you give him the maximum time you can. He didn't care about our lives, our children, our families." *Id.*

Also concerning from a public safety standpoint is the escalating nature of Babudar's criminal conduct. As noted, Babudar has steadily escalated from relatively petty, misdemeanor offenses, to violent robberies, many of which involved the threat of deadly force. Imprisonment is the only proven method to protect the public from further crimes by Xaviar Babudar, and this factor further justifies a lengthy sentence.

### 5. A Lengthy Term of Imprisonment Would Not Adversely Affect Defendant's Health, Educational, or Vocational Progress

Babudar has no reported physical, mental, or emotional health issues (*see* PSR ¶¶ 172-73) and also asserts he does not drink alcohol to intoxication and does not have any substance abuse problems. *See* PSR ¶¶ 174-75. A lengthy term of imprisonment would not impair Babudar's health, nor would it deprive him of any needed medical treatment.

From an educational standpoint, Babudar claims to have earned a general equivalency degree while in California following a period of online homeschooling (but this is unconfirmed). *See* PSR ¶ 176. Babudar's employment history does not show he held any job after 2017; his last reported job or employment of any kind was at an Amazon Warehouse, which Babudar claims he left because he was "just tired of it" and wanted a change of scenery. *See* PSR ¶ 178.

The Court's imposition of a lengthy term of imprisonment would not adversely affect Babudar's educational or vocational progress, as any stunted progression in these areas is due to Babudar's own life choices and a demonstrated insouciance towards maintaining any form of gainful employment.

### 6. A Lengthy Sentence is Consistent for Similar Conduct

Babudar's large number of violent robberies spanning multiple states over a short period of time are in a class of their own, which frustrates an effort to consider any similar conduct. According to the United States Sentencing Commission, the median loss for robbery offenses sentenced under U.S.S.G. §2B1.3 was $1,729, and only 4.7% of these sentences involved loss amounts greater than

Case 4:23-cr-00181-HFS   Document 49   Filed 08/30/24   Page 27 of 31

$95,000.[9] Babudar's total yield from these robberies is more than *490 times* the median loss in robberies sentenced under §2B1.3. Despite this low median in cases sentenced under this section, the average sentence for all robbery offenders was 107 months' imprisonment. *Id.*

The mean sentence for robbery defendants sentenced within the Eighth Circuit district courts is 120 months' imprisonment, and the median is 100 months' imprisonment.[10] The mean and median sentences for defendants convicted on robbery charges in the Western District of Missouri were higher, at 129 months' and 108 months' imprisonment, respectively.[11] Most of those convictions presumably involved only one or two robberies or attempted robberies, not almost a dozen.

Babudar's numerous robberies, and the aggregate amount stolen during those robberies, place him far above the average defendant typically sentenced in federal court. A lengthy sentence would be commensurate to Babudar's crimes.

## C.  Victim Impact

Due to the large number of Babudar's robberies and attempted robberies, there are dozens of victims in this matter. The financial institutions – each of them affected victims for sentencing and restitution purposes – could be made whole by an entry of an order for restitution; their losses are

---

[9] *See* U.S. Sentencing Commission's "Quick Facts – Robbery Offenses" (August 2023), p. 1, at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Robbery_FY22.pdf. (last accessed August 30, 2024.)

[10] See United States Sentencing Commission, Statistical Information Packet for Fiscal Year 2023, Eighth Circuit (April 2024), p. 11, at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2023/8c23.pdf  (last accessed August 30, 2024).

[11] See United States Sentencing Commission, Statistical Information Packet for Fiscal Year 2023, Western District of Missouri (April 2024), p. 11, at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2023/mow23.pdf  (last accessed August 30, 2024).

easily quantifiable and accounted for. But institutions are also made up of individuals, and there were many employees of these banks and credit unions who were individually and uniquely affected by Babudar's violent acts. This Court has read those respective victim impact statements, some of which are quoted herein with the victims' permission.

### D. Recommended Sentence for Monetary Penalties

#### 1. Restitution and Forfeiture

For the reasons set forth above, the United States recommends that the Court enter a mandatory restitution order of $532,455. *See* PSR ¶¶ 40, 214. The United States further seeks forfeiture of an autographed painting of Chiefs quarterback Patrick L. Mahomes II, recovered by the Kansas City FBI, as agreed by the parties in the Plea Agreement. *See* Plea Agt. ¶¶ 2, 6(j). On July 29, 2024, the Court entered a preliminary order of forfeiture as to this painting. (Doc. 45).

#### 2. Fine

In light of the need for restitution, the United States does not object to the Court waiving imposition of a fine. There is no evidence Babudar has the present ability to pay such a fine (*see* PSR ¶ 183) though, should the Court choose to impose a fine in this case, the fine range for these offenses is between $40,000 and $500,000. *See* PSR ¶¶ 205-211.

### III. CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court grant an upward variance from the Guidelines in sentencing defendant Xaviar Michael Babudar, to be followed by a three-year term of supervised release. The United States further requests this Court order mandatory restitution as a condition of supervised release.

Respectfully submitted,

TERESA A. MOORE
United States Attorney, Western District of Missouri

By      /s/ Patrick D. Daly

PATRICK D. DALY
Senior Litigation Counsel

STEPHANIE C. BRADSHAW
Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 East 9th Street, Room 5510
Kansas City, Missouri 64106
Telephone: (816) 426-3122

CLINTON J. JOHNSON
United States Attorney, Northern District of Oklahoma

/s/ Eric O. Johnston

ERIC O. JOHNSTON
Assistant United States Attorney

30

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was delivered on August 30, 2024, to the CM-ECF system of the United States District Court for the Western District of Missouri for electronic delivery to all counsel of record.

_/s/ Patrick D. Daly_

Patrick D. Daly
Senior Litigation Counsel
